# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT COTTO, ON BEHALF OF HIMSELF AND ALL OTHER SIMILARLY SITUATED EMPLOYEES KNOWN AND UNKNOWN, | ) ) ) ) | |
| | ) | No. 13 C 842 |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| JOHN C. BONEWICZ, P.C., AN ILLINOIS PROFESSIONAL CORPORATION, JOHN C. BONEWICZ, INDIVIDUALLY, AND MELISSA MANDARICH, INDIVIDUALLY, | ) ) ) ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Cotto, individually and on behalf of a putative class, has sued defendants John C. Bonewicz, P.C. ("JCB"), John C. Bonewicz (individually), and Melissa Mandarich for alleged violations of the Fair Labor Standards Act ("FLSA") (unpaid overtime and retaliation), the Illinois Minimum Wage Law ("IMWL"), the Illinois Wage Payment and Collection Act ("IWPCA"), and unjust enrichment. The defendants have moved for summary judgment on Cotto's claims, arguing that: (1) Cotto was exempt from federal and state overtime requirements because he worked in a bona fide administrative capacity; (2) they did not retaliate against him for exercising rights protected by the FLSA; and (3) the FLSA preempts Cotto's common law unjust enrichment claim. For the following reasons, the Court grants the defendants' motion in part, and denies it in part.

## BACKGROUND

Defendant JCB is a law firm and debt collector. R. 47 ¶ 1; R. 59-4 ¶ 2. Cotto began working for JCB as a debt collector in February 2011 in the law firm's office in Skokie, Illinois. R. 47 ¶¶ 3-4. JCB paid Cotto hourly in that capacity. R. 47 ¶ 2. Cotto disliked the position and was prepared to quit a few weeks after joining JCB when he accepted another, untitled position within the firm. *Id.* at ¶ 4. In a draft resume that Cotto sent to a relative who worked for a prospective employer, Cotto gave his position at JCB the title, "lead auditor/human resources specialist." *Id.*; *see also* R. 59-4 ¶ 11. In his new position at JCB, Cotto received a salary of $1,307.69 every two weeks. R. 47 ¶ 6. Defendant Melissa Mandarich was Cotto's supervisor. *Id.* at ¶ 7.

During his deposition in this case, Cotto confirmed that the following items in his draft resume accurately described his job responsibilities: (1) "Reconcile credit accounts in excess of one million dollars using both Y2Payment Gateway and Bank of America Cash Pro for our offices in Skokie, IL and Woodland Hills, CA"; (2) "Monitor and audit funding sources"; (3) "Order supplies for the office and maintain an inventory list"; (4) "Negotiate contracts for all outside services"; (5) "Run background checks on new employee prospects and make recommendations to personnel"; (6) "Conduct orientation for new employees"; (7) "Provide new employees with initial paperwork and FDCPA test"; (8) "Work with USPS, UPS, DHL, and Fed Ex to send packages and handle all shipping issues that arise"; (9) "Audit and repair customer accounts"; (10) "Work closely with Square Two Financial to find

resolutions for any payment discrepancies"; (11) "Create and edit guidelines for payment processing, background checks, and supply ordering for the offices in Illinois and California." R. 38, Ex. III, at RC00012 (draft resume);[1] *see also* R. 47 ¶¶ 9-12, 15-23. Besides these functions, the defendants contend that Cotto performed "vendor cost analysis" and made vendor recommendations that JCB would "routinely accept." R. 47 ¶ 14. Cotto denies that he "routinely" performed "vendor cost analysis" except in connection with purchasing office supplies at retail stores like Staples. R. 47 ¶ 23. It is undisputed that he did not have independent authority to make larger purchases (e.g., computers and office furniture). *Id.* at ¶ 11. With respect to employee background checks, Cotto identified a company that would produce the background checks more quickly than JCB's former vendor. *See* R. 55-1 at 47. On the law firm's behalf, Cotto signed the form agreement retaining the background-check company's services. *See* R. 38, Ex. III, at RC00078-83. The defendants contend that Cotto "create[d] guidelines for human resources to ensure all the correct documents were obtained from and for employees." R. 47 ¶ 24. Cotto responds that he created a simple checklist listing requirements for new employees (e.g., completing tax forms, obtaining key cards). *See* R. 38, Ex. III, at RC00058. It is undisputed that he made "sure employees punched 'in and out on time,'" *see* R. 47 ¶

---

[1] The Court granted the defendants' motion for leave to file Exhibit III to their memorandum of law—Cotto's deposition and the exhibits thereto—under seal. *See* R. 39. Insofar as the Court has relied on that document to reach its decision, the contents belong in the public record. *See Baxter Intern., Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002) ("[T]hose documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

25, but the scope of this responsibility is unclear. For example, the defendants have not cited evidence that Cotto disciplined employees who did not punch "in and out on time."

The defendants contend that, in connection with JCB's move from Skokie to Chicago, it was Cotto's responsibility to "make sure everything was getting done that [the Director of Operations] wanted to get done." *Id.* at ¶ 26. Mandarich testified that Cotto was responsible for the following items in connection with JCB's move:

> Um, related to—um, you know, various things that came up related to moving to the new office. He went down there a few times to deal with various vendors, um, you know, he had. He was acting as our representative—company representative, company agent—to, you know, deal with the painters for the whiteboard area, so he was directing them on, you know, where to put it, how big it should be. Um, he also did a cost-benefit analysis for that, between either applying the whiteboard material or doing the whiteboard paint. Um, he said that the paint was cheaper, which actually ended up not being the case, but we found that out after the fact. Um . . . so, he, you know, managed the painters there, and then, also, the sign vendor for the front door, for the company sign. He also worked with, I think it was, AT&T to install the fax line and to ensure that was being done properly. That was his involvement related to the move, but he was engaged with vendors to get the work done and overseeing that.

R. 55-1 at 47-48; *see also* R. 47 ¶ 27. Cotto signed the agreement retaining Impact! Signs to create and apply JCB's name to the new office's entryway door. R. 38, Ex. III, at RC00076. When Impact! Signs installed the sign incorrectly, Cotto corresponded with a representative of the company to correct the problem. *See* R. 35-4.

Cotto argues that his primary duty at JCB was to "reconcile" incoming debt payments with the particular accounts to ensure that the payments were applied correctly. R. 59-4 at ¶ 5. Cotto's and Mandarich's testimony about this task is vague and difficult to follow. As the Court interprets the record, Cotto prepared a spreadsheet listing payments made by debtors for a given day. *Id.* at ¶¶ 6-7. He would then compare that information with "what was in the system" to make sure that the payments were accurately posted to the debtors' accounts. *Id.* at ¶¶ 6-7. If Cotto found discrepancies, he had to call a person named "Lois" at Square Two Financial, who would remedy the mistake. *Id.* at ¶ 8. Cotto testified that he believed JCB was a franchisee of Square Two Financial. *Id.* at ¶ 9. The defendants contend that Square Two Financial was a client of the law firm. *Id.*[2] They concede that Cotto could not alter information once it was entered into "the operating system." *Id.* They contend, however, that "[i]n reconciling credit card payments to the bank deposits from the merchant provider, Cotto had the authority and discretion to directly reverse, alter or change payment amounts in the merchant account." *Id.*

Sometime in early February 2012, Mandarich told Cotto that she wanted him to stay later to reconcile accounts for JCB's California office. R. 47 ¶ 31. Cotto

---

[2] The Court takes judicial notice of the fact that JCB's website bears a striking resemblance to Square Two Financial's, even sharing the same slogan ("The Fair Square Promise") and stock photography. *Compare* http://www.squaretwofinancial .com/, last visited May, 21 2015, *with* http://www.bonewiczlaw.com/, last visited May 21, 2015; *see also Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 WL 3368893, at *2 (N.D. Ill. July 8, 2014) (Durkin, J.) (the appearance of a party's website is a "proper subject[] of judicial notice" because it "'can be accurately and readily determined' by using well-known, non-party web browsers 'whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b))).

told Mandarich, "that's a little—that's a little bit ridiculous" because he "was only getting paid for eight hours." *Id.* But "if she [was] willing to pay him, you know, hourly then, he wouldn't have a problem staying and working." *Id.* Cotto did not make any written complaints to his supervisors about not receiving overtime pay. *Id.* at ¶ 34. On February 10, 2012, Cotto called in sick to work. *Id.* at ¶ 41. Later that day, Mandarich asked Cotto via text message whether he was going to come into work. *Id.* at ¶ 43. After Cotto told her that he wasn't, the exchange became contentious:

> Mandarich: Are u not coming into work today?
>
> Cotto: No am at the doctors I call in sick talk to greg, alina and calvin
>
> Mandarich: Ur so full of crap
>
> Cotto: Don't ever text me like that!
>
> Cotto: You have no right to text me like that.
>
> Mandarich: Ur . . . bad attitude, so predictable, u don't like ur new desk u call off for 3 days, u don't like the things I brought to your attention ur sick today, grow up
>
> Cotto: No I'm sick but since we are talking about attitudes look at yours never have I worked with someone like u something doesn't go your way and u get loud [a]nd yell bad words at me and every one else.
>
> Mandarich: Something doesn't go my way? Ur incompetent
>
> Mandarich: What bad words did I yell at u?
>
> Mandarich: Don't bother coming back here you're fired.

R. 38, Ex. III, at Ex. K to Cotto Dep. The defendants contend that Mandarich fired Cotto for "insubordination." R. 35 at 19-20. Cotto argues that this explanation is

pretext for retaliation, citing his statement several days earlier about being paid hourly and the relatively benign nature of his comments to Mandarich. *See* R. 48 at 16-19.

Cotto's five-count amended complaint asserts claims against the defendants for unpaid overtime under the FLSA (Count I) and the IMWL (Count II), unpaid "regular wages" under the IWPCA (Count III), FLSA retaliation (Count IV), and unjust enrichment (Count V). *See* R. 14.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

ANALYSIS

## I.    The Administrative Exemption

"Under the FLSA, employees are entitled to overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012).[3] The defendants argue that Cotto is exempt from the FLSA's overtime requirements as an "employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). It is the defendants' burden to establish that Cotto qualifies for the exemption. *See Schaefer-LaRose*, 679 F.3d at 571. "As a remedial statute, the exemptions are narrowly drawn against the employers, and limited to those establishments plainly and unmistakably within their terms and spirit." *Id.* (citations and internal quotation marks omitted). The Secretary of Labor has promulgated regulations defining the elements of the administrative exemption:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by

---

[3] The relevant provisions of the IMWL are substantially similar to the FLSA. *See* 820 ILCS 105/4a(2)(E) (incorporating the FLSA's exemption for bona fide administrative employees). So, the Court's analysis of Cotto's FLSA claim applies equally to his IMWL claim. *See Callahan v. City of Chicago*, No. 12 C 362, 2015 WL 394021, *24 (N.D. Ill. Jan. 23, 2015) ("Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both.").

employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Cotto concedes that he satisfies the first prong, and has expressly elected not to address the second prong. *See* R. 48 at 1, n.1. He contends, however, that his primary duty at the law firm did not entail "the exercise of discretion and independent judgment with respect to matters of significance." *Id.*

Whether an employee qualifies for the administrative exemption "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose*, 679 F.3d at 572; *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 870 (7th Cir. 2008) ("An employee's title is not controlling; courts instead must engage in a case-by-case analysis of the employee's duties and responsibilities."). The regulations provide detailed guidance regarding the relevant factors courts should consider:

(a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when

determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

[. . .]

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

(e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *See also* § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect. Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

29 C.F.R. § 541.200(a)(3); *see also Schaefer-LaRose*, 679 F.3d at 577-78. "Determining the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law." *Roe-Midgett*, 512 F.3d at 869.

It is undisputed that Cotto's day-to-day responsibilities included: (1) managing the law-firm's office supplies; and (2) "reconciling" payments that JCB received from debtors. He had independent authority to determine what supplies were needed, *see* R. 47 ¶¶ 11, 23, but the defendants have not shown that this routine office task constituted a "matter of significance." With respect to payment reconciliation, Cotto contends that this task merely required comparing the figures on two spreadsheets to determine whether they matched. *See* R. 59-4 ¶¶ 6-7. The

defendants dispute Cotto's characterization, but they do not clearly explain the grounds for their objection:

> 6.     The plaintiff accomplished this by using two spreadsheets – one that listed the credit cards he ran that day, and another that listed the debtors' accounts that had made payments that day. C. Dep., P. 18, L. 12-14; M. Dep., P. 44, L. 6-10.
>
> ANSWER: DENY. Plaintiff testified that he would reconcile credit cards by "put[ting] them on a spreadsheet and mak[ing] sure that it was accurate [with] what was in the system that we ran." C. Dep., P. 18, L. 12 -17. Plaintiff would create a spreadsheet with information from running credit cards and reconcile it with numbers in the credit card system. C. Dep., P. 19, L. 15- P. 20, L. 4-7. Melissa Mandarich further clarified that Plaintiff did the "daily reconciling between payments that were entered in the operating system and what's showing . . . in the merchant account, related to the credit cards." M. Dep., P. 44, L. 6-10. There is no evidence in the record to support the proposition that Plaintiff merely compared one spreadsheet to another.

*Id.* at ¶ 6. Whether Cotto compared figures on two spreadsheets, or compared one spreadsheet with information in the "credit card system," he still compared two (or more) sets of numbers to ensure that they matched. This type of clerical work does not constitute discretion and independent judgment within the meaning of the exemption. *See* 29 C.F.R. § 541.200(a)(3)(e) ("The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a 'statistician.'"); *see also Urnikis-Negro v. Am. Family Prop. Servs., Inc.*, No. 06 C 6014, 2008 WL 5539823, at *2-3 (N.D. Ill. July 21, 2008) (concluding that the plaintiff's "issue-spotting" responsibilities with respect to appraisal reports did not entail exercising discretion and independent judgment). In response to Cotto's

statement of additional facts, the defendants contend that "[i]n reconciling credit card payments to the bank deposits from the merchant provider, Cotto had the authority and discretion to directly reverse, alter or change payment amounts in the merchant account." R. 59-4 ¶ 8. The defendants do not define the terms "merchant provider" and "merchant account," nor have they explained how often Cotto altered payment amounts or how this task related to JCB's business more generally. Also, they have not identified any factors that would guide Cotto's decision whether to "reverse, alter or change payment amounts." Once information was entered into the "operating system"—another vague, undeveloped concept—Cotto did not "have the ability to reverse or alter the payments." *Id.* Instead, he had to contact someone at Square Two Financial to remedy the issue. *Id.* Mandarich stated in her deposition that Cotto would "talk to the client [Square Two Financial] and, you know, problem-solve with them or tell them what's going on." R. 47-1 at 45. Again, it is unclear what "problem-solve" means in this context, and whether it adds anything to Cotto's undisputed responsibility to identify discrepancies for Square Two Financial to correct.

Viewing the evidence in the light most favorable to Cotto, his other job responsibilities only sporadically involved discretion and independent judgment, and/or concerned relatively insignificant matters. His admissions in his deposition regarding his draft resume are certainly relevant, but they only take the defendants so far. In response to a series of questions calling for "yes" or "no" responses, Cotto confirmed that his resume accurately stated that he "[m]onitor[ed] and audit[ed]

funding sources" and "[a]udit[ed] and repair[ed] customer accounts." *See* R. 38, Ex. III, at 68-69. These responsibilities are vague on their face, and the defendants have not linked them to any particular task that Cotto performed for JCB. Cotto also stated that he "[n]egotiate[d] contracts for all outside services." *Id.* at 69. Negotiating on behalf of an employer is a relevant factor, but the regulation indicates that the nature of the contract being negotiated is also important. *See* 29 C.F.R. § 541.200(a)(3)(b) (relevant factors include "whether the employee has authority to negotiate and bind the company *on significant matters*") (emphasis added). The defendants have not cited any particular instance where Cotto negotiated a "significant" contract for the firm. They have identified only two contracts bearing his signature: (1) the contract retaining the background-check vendor; and (2) the contract with respect to the sign for the office door. The fact that Cotto recommended a different background-check vendor indicates that he exercised discretion in that instance. The contract itself, however, appears to be the vendor's standard form. *See* R. 38, Ex. III, at Ex. B, RC00077-83 ("easyBackgrounds End-User Agreement"). There is no evidence that Cotto negotiated any of its terms, nor any evidence regarding the cost of the vendor's services. Likewise, there is no evidence that the office sign agreement entailed any negotiation, and it appears to have involved only a minor expenditure. *See* R. 35-4 at RC00260 (Email from Impact! Signs to Cotto: "Thank you for your business. We have received your payment in the amount of $300.00 for invoice number 10990."). Also, like the other tasks that Cotto performed in connection with the law firm's move to Chicago,

ordering a new sign for the office door does not appear to have been a routine part of his job duties. A reasonable jury could conclude that the defendants asked Cotto to run errands in connection with a one-off event (the firm's move to Chicago) only tangentially related to JCB's day-to-day business.

In sum, viewing the evidence in the light most favorable to Cotto, there are material factual disputes regarding Cotto's duties. Thus, the defendants are not entitled to summary judgment on his FLSA and IMWL claims.

## II.    Retaliation

Cotto alleges that the defendants fired him in retaliation for his complaints about his wages and hours. The FLSA makes it unlawful for an employer,

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .

29 U.S.C. § 215. It is Cotto's burden to establish that the defendants retaliated against him, "utilizing either the direct or indirect method of proof." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Cotto attempts to satisfy his burden using the direct method. *See* R. 48 at 13, 16. "To establish a prima facie case of retaliation under the direct method, [Cotto] must show: (1) that he engaged in protected expression; (2) that he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." *Kasten*, 703 F.3d at 972. The defendants challenge the first and third elements.

### A.    Protected Expression

On at least two occasions, Cotto orally complained to Mandarich that he was only paid for 8 hours of work, but was required to work longer. *See* R. 38, Ex. III, at 36-37, 49-51. In *Kasten v. Saint-Gobain Performance Plastics Corp.*, the Supreme Court held that § 215 protects oral complaints, reversing the Seventh Circuit. 131 S.Ct. 1325, 1336 (2011) ("We conclude that the Seventh Circuit erred in determining that oral complaints cannot fall within the scope of the phrase 'filed any complaint' in the Act's antiretaliation provision."). It recognized, however, that employers are entitled to "fair notice" that the employee "is in fact making a complaint about an Act violation." *Id.* at 1334. To constitute protected expression, oral statements must contain "some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Id.* Specifically, "[t]o fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.*

On remand in *Kasten*, the Seventh Circuit held that the plaintiff's complaints were sufficiently clear to provide a reasonable employer with fair notice that he was asserting his rights under the FLSA. 703 F.3d at 975-76. The plaintiff produced evidence that he complained "multiple times" that the location of his employer's time clocks "away from the donning and doffing area was 'illegal.'" *Id.* at 969. He

told his supervisors on "three or four occasions" that he was "considering starting a lawsuit about it." *Id*. On two occasions, the plaintiff told his supervisors that the company "would lose" if the location of the clocks was "challenged in court." *Id*. at 970. Moreover, internal correspondence showed that the company's management was aware that the location of the time clocks might be illegal. *Id*. ("[A]s you know we need to move our Kronos clocks to ensure that we are in compliance with Wage and Hour law which states that employees are to be paid for the time used to gown/prepare for work. Lani and I walked out to review our current set-up and to determine what we should do to become compliant."). The Seventh Circuit concluded that a reasonable employer in the defendant's position "would have received fair notice that [the plaintiff] was asserting rights under the FLSA." *Id*. at 976.

The defendants cite three cases applying *Kasten* and finding that the plaintiffs' complaints were insufficiently clear to provide fair notice to their employers that they were asserting their FLSA rights. *See Lasater v. Texas A & M University-Commerce*, 495 Fed. Appx. 458 (5th Cir. 2012); *Hawks v. Forest River, Inc.*, No. 3:09-CV-532-CAN, 2011 WL 5434241 (N.D. Ind. Nov. 8, 2011); *Courtright v. Board of Cnty. Comm'rs of Payne Cnty., Okla.*, No. CIV–08–230–D, 2011 WL 2181954 (W.D. Okla. June 3, 2011). In *Lasater*, the plaintiff made comments regarding the defendant's compensation policies in connection with a routine audit. 495 Fed. Appx. at 459-60, 462. The Fifth Circuit held that the plaintiff's statements did not constitute a "complaint," relying primarily on the fact that she was

responding to the auditor's questions as part of her ordinary job duties. *Id.* at 462. She was not "lodging a personal complaint about the wage and hour practices of her employer and asserting rights adverse to her company." *Id.* (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1481 (10th Cir. 1996) (internal quotation marks omitted)). More relevant to this case, the *Lasater* court also held that her statements were not protected because they were not "framed in terms of potential illegality." *Id.* at 463 n.1; *see also id.* at 462 ("Though a plaintiff need not explicitly refer to the FLSA statute itself, the complaint does need to be framed in terms of potential illegality." (citing *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 626 (5th Cir. 2008))). In *Courtright*, the court held that the plaintiff's "statement that he did not want to attend a training session on his day off without pay [was] insufficient to be understood by a reasonable employer as making an overtime wage complaint or otherwise asserting FLSA rights." 2011 WL 2181954, at *11. The plaintiff in *Hawks* told her supervisor "'in passing, that [she] was aware that the guys in our group were making 3 to 400 dollars more a week than we were.'" 2011 WL 5434241, at *8. The court held that the plaintiff's statement that she was "aware" that men in her group were paid more did not constitute a "complaint" under § 215. *Id.* at *8-9.

Cotto relies chiefly on *Wittenberg v. Wheels, Inc.*, 963 F. Supp. 654 (N.D. Ill. 1997), a pre-*Kasten* case holding that the plaintiff engaged in protected expression on facts analogous to this case. *See* R. 48 at 14. In *Wittenberg*, the defendant told the plaintiff, a salaried employee, that she would have to work extra hours. *Id.* at 656. After informing her supervisors on at least two prior occasions that she was not

going to work the extra hours because she was not "getting paid for them," she left the office one day after working only eight hours. *Id.* On her way out of the office, she told her supervisor that she was leaving "[b]ecause I'm not getting paid," *id.*, and she reiterated her complaint when she returned to work the following day. *See id.* at 657 ("I'm not getting paid for it . . . . No, I'm not going to work the extra hour."). The defendant fired her that same day for insubordination. *Id.* In its motion for summary judgment, the defendant argued that the plaintiff had not established a prima facie case of retaliation because she had not engaged in "statutorily protected expression." *Id.* at 661. Rather, she "only voiced 'vague complaints' to her supervisor that [the defendant's] 'failure to pay overtime was improper.'" *Id.* at 662. The *Wittenberg* court rejected the defendant's argument, holding that § 215 applies to an employee's informal complaints to his or her employer:

> Wheels' argument in this regard is merely a reiteration of the argument that it made in its motion to dismiss, and will therefore be rejected on that basis. Just as courts have found that an employee need not have filed a complaint, testified, or served on an industry committee to state a claim under § 15(a)(3), courts have found that complaints such as the ones in this case fall under § 15(a)(3)'s protection.

*Id.*; *see also Cuevas v. Monroe St. City Club, Inc.*, 752 F. Supp. 1405, 1412-13 (N.D. Ill. 1990) ("[T]he fact that Robinson was asserting (however unclearly) his right to get paid for hours worked is enough to constitute protected activity.").

*Wittenberg* did not address the plaintiff's complaints from the perspective of a reasonable employer, an analysis that *Kasten* now requires in retaliation cases based upon oral complaints. 131 S.Ct. at 1334. Cotto testified that he talked to

Mandarich approximately "three times" about receiving a "raise," R. 38, Ex. III, at 49, a request that he apparently couched in terms of being paid hourly. *See id.* at 51 ("I asked her if there is any chance we can talk about a raise and making me hourly."). The first instance occurred "maybe a couple months after [he] got the position." *Id.* During that conversation, Mandarich told him to "write down all the stuff . . . that makes me think I deserve a raise." *Id.* at 50. Cotto told her that he had taken on new responsibilities, beyond "running credit cards," causing him to stay at the office later. *Id.* And because he was staying later, he "should be getting paid for the hours that [he was] putting in." *Id.* Mandarich refused Cotto's request. *Id.* at 51.[4] Several months after this conversation, in early February 2012, Mandarich asked Cotto to work even later:

> [Mandarich] had another office in California and she wanted me to basically come in and do my job for the Chicago office, stay and work and close out the accounts for the California office, get paid only for eight hours and stay in the office for probably 12 to 16 hours because the other office had different hours. So you figure two hours difference for California, she wanted me to stay there, wait, and work—when I started—when I told her that, you know, that's a little—that's a little bit ridiculous, she told me that those were banker hours, you should get used to them.

*Id.* at 36-37; *see also id.* at 37 ("[I] didn't tell her that it was too many hours, I just told her that that's a little bit ridiculous because, you know, I'm only getting paid for eight hours. If she is willing to pay me, you know, hourly, then I wouldn't have a problem staying and working.").

---

[4] Cotto could not recall when the other two conversations with Mandarich about receiving a raise occurred. *See* R. 38, Ex. III, at 51.

The Court concludes that Cotto's complaints were insufficient to notify a reasonable employer that he was asserting his rights under the FLSA. After *Kasten*, general complaints about wages and/or hours are insufficient. *See Shadduck v. United Parcel Serv., Inc.*, No. 10 C 2203, 2011 WL 4452210, at *3 (N.D. Ill. Sept. 26, 2011) ("An employee is not, however, entitled to FLSA protection just because he has made a complaint about wages or hours." (citing *Kasten*, 131 S.Ct. at 1335)); *cf. Wittenberg*, 963 F. Supp. at 662. The plaintiff in *Kasten* pointedly challenged the legality of his employer's policy. *See Kasten*, 703 F.3d at 969-70. The plaintiff in *DeWalt v. Greencroft Goshen, Inc.* asked her employer on three separate occasions whether she was an "hourly" or a "salaried" employee, and was fired on the same day that she told her employer that "she had done some research on the FLSA and believed that her position was hourly and non-exempt." 902 F. Supp. 2d 1127, 1140 (N.D. Ind. 2012). Cotto's complaints are vague in comparison and not framed "in terms of potential illegality." *Lasater*, 495 Fed. Appx. at 462, 463 n.1. He told Mandarich at some point during the first half of 2011 that: (1) he deserved a raise because he was working longer hours, and (2) he wanted to be paid hourly. *See* R. 38, Ex. III, at 50-51. Months later, he told Mandarich that it was "a little bit ridiculous" that she was asking him to work 12-16 hour days when he was paid "only for eight hours." *Id.* at 36-37. These comments would not suggest to a reasonable employer that Cotto was asserting a *legal right* to overtime pay. *See Kasten*, 131 S.Ct. at 1334 (agreeing with the defendant employer that it should not be "left in a state of uncertainty about whether an employee (particularly an

employee who seems unusually angry at the moment) is in fact making a complaint about an Act violation or just letting off steam"); *see also Lasater*, 495 Fed. Appx. at 461 ("Not all 'abstract grumblings' or vague expressions of discontent are actionable as complaints." (quoting *Valerio v. Putnam Associates Inc.*, 173 F.3d 35, 44 (1st Cir. 1999))). No reasonable jury could find that Cotto's complaints were protected activity under the FLSA.

## B. Causation

Even assuming that Cotto had engaged in protected expression, he has not established a material factual dispute with respect to causation. A plaintiff may establish retaliation under the direct method using either direct or circumstantial evidence. *Kasten*, 703 F.3d at 972. Circumstantial evidence "may include: (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Id.* Cotto contends that "[i]n the months following [his] request to be paid hourly, [Mandarich] became increasingly hostile to [him], often yelling at him in front of his co-workers." R. 59-4 ¶ 26. In the portion of his deposition that he cites to support this assertion, Cotto merely testified that he was yelled at "a lot . . . towards the end." R. 38, Ex. III, at 116. He did not link Mandarich's hostility to his request to be paid hourly. In fact, he testified that Mandarich yelled at "everyone":

> Q. Well, you said you were yelled at quite a bit at the end of your employment, do you recall any other instances?
>
> A. I don't know. Like whenever she would get upset instead of sitting down and talking with you about what she was mad about, she would

> just get into a rage and start yelling at you and cursing you out in front
> of everybody, slamming doors. She would do this to everyone.
>
> Q. So all sorts of different subjects?
>
> A. Yes.

*Id.* at 117; *see also* R. 59-4 ¶ 27. This leaves only the relatively short time period between Cotto's termination and his response to Mandarich's demand that he work more hours. "Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky v. Means-Knaus Partners, L.P.,* 777 F.3d 892, 898 (7th Cir. 2015). Here, there is nothing in the record to bolster the inference created by the temporal proximity of Cotto's complaint and his termination. His argument that his termination for insubordination was pretext for retaliation is unpersuasive. Cotto is entitled to the inference that Mandarich wrongly accused him of malingering, but there is no evidence in the record suggesting that she did not genuinely believe that he was not ill. And while Mandarich's language in her text messages was unprofessional, nothing about the exchange suggests that Cotto's statement that it was "a little bit ridiculous" that Mandarich was asking him to work more hours motivated her decision to terminate him. In sum, even assuming that Cotto had engaged in protected conduct, no reasonable jury could conclude that Mandarich fired him because of that conduct.

## III.    IWPCA

In Count III of his amended complaint, Cotto alleges that he and the defendants "agreed that [he] would be paid at the rate of about $16.80 per hour for 40 hours per week." R. 14 ¶ 111. The IWPCA requires employers "at least semi-monthly to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3. The statute defines "wages" as "any compensation owed to an employee by an employer pursuant to an employment contract or agreement between 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." *Id.* at 115/2. The defendants argue that the IWPCA is inapplicable because JCB's employee handbook disclaims the creation of "any type of contract." R. 35 at 11; R. 47 ¶ 53. The disclaimer is irrelevant because Cotto does not rely on the handbook as the source for any particular right described therein. *Cf.*, *Garcia v. Kankakee Cnty. Hous. Auth.*, 279 F.3d 532, 535-36 (7th Cir. 2002) ("Disclaimers of this kind are enough in Illinois to show that *the handbook* does not create legal rights.") (emphasis added). On the other hand, he has not cited any other evidence supporting his allegation that the defendants agreed to pay him "$16.80 per hour for 40 hours per week." R. 14 ¶ 111. On the contrary, it is undisputed that Cotto was a salaried employee. *See* R. 47 ¶¶ 5-6. In response to the defendants' motion, Cotto argues only that he is entitled to a remedy for unjust enrichment "if" he cannot obtain relief under the IWPCA. *See* R. 48 at 2 ("If, as the defendants contend, the [IWPCA] is unavailable (for lack of an agreement between the parties), Cotto must not be left without a remedy."); *see also id.* at 21 ("If the

IWPCA fails to provide a remedy, unjust enrichment should fill the void."). He has not attempted to refute the defendants' arguments that his IWPCA claim is deficient. The defendants are entitled to summary judgment on Cotto's IWPCA claim.

## IV. Unjust Enrichment

Cotto acknowledges that the FLSA preempts common law claims that are "coextensive" with its coverage. R. 48 at 19; *see, e.g.*, *Deschepper v. Midwest Wine and Spirits, Inc.*, No. 13 C 8379, 2015 WL 1433230, *8 (N.D. Ill. Mar. 26, 2015) ("To the extent that a plaintiff asserts that an employer wrongfully withheld compensation in violation of state common law based on the same factual allegations supporting an FLSA claim, her state law claim is preempted."). He argues, however, it does not preempt claims that "fall in the gap between minimum wage and overtime premium (regular wages or 'gap pay' not recoverable under the FLSA or the IMWL)." R. 48 at 19 (citing *Sanchez v. Haltz Const., Inc.*, No. 09 C 7531, 2012 WL 13514, *8 (N.D. Ill. Jan. 4, 2012)). Cotto argues that "when [he] worked more than 40 hours per week . . . not only did the defendants fail to pay him overtime compensation, they also failed to pay him regular wages (gap pay) for those hours." R. 48 at 21. Cotto's unjust enrichment claim lacks merit. If Cotto is exempt from the overtime laws, then he is not entitled to any compensation above and beyond his salary. The "gap pay" Cotto seeks is really just a raise, which the defendants were not legally required to give him. If he is not exempt, then he is

entitled to overtime pay as provided in the FLSA and his unjust enrichment claim is preempted. In either case, his unjust enrichment claim fails.

## Conclusion

For the foregoing reasons, the Court grants the defendants' summary judgment motion (R. 34) in part, and denies it in part. The defendants' motion is granted with respect to Count III (IWPCA), Count IV (FLSA retaliation), and Count V (unjust enrichment). The Court concludes that there is a material factual dispute regarding the scope of Cotto's job duties precluding summary judgment on his claims for overtime in Count I (FLSA) and Count II (IMWL). The Court sets a status hearing for June 16, 2015 at 9:00 a.m. to set the case for trial.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: June 9, 2015